# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**BROGAN W. RAFFERTY,**

          **Petitioner,**

    **-vs-**

**WARDEN ED SHELDON,**

          **Respondent.**

**CASE NO. 5:17-CV-01169**

**JUDGE PAMELA A. BARKER**

**MAGISTRATE JUDGE JAMES R. KNEPP II**

**MEMORANDUM OF OPINION AND ORDER**

This matter is before the Court upon the Report & Recommendation ("R&R") of Magistrate Judge James R. Knepp II (Doc. No. 26), which recommends denying the Petition for Writ of Habeas Corpus (Doc. No. 1) of Petitioner Brogan W. Rafferty ("Petitioner"). Petitioner has filed Objections to the R&R. (Doc. No. 34.) For the following reasons, Petitioner's Objections (Doc. No. 34) are OVERRULED, the Magistrate Judge's Report & Recommendation (Doc. No. 26) is ADOPTED as set forth herein, and the Petition (Doc. No. 1) is DENIED.

## I. Background

### a. Factual Background

The Court of Appeals for the Ninth District of Ohio (hereinafter, "state appellate court") summarized the facts underlying Petitioner's state court conviction as follows:

> {¶ 2} In August of 2011, Mr. Rafferty was sixteen years old. At that time, his friend Richard Beasley, a man in his fifties, devised a plan to rob and murder men who responded to a posting that Mr. Beasley created for a non-existent job as the caretaker of a 680–acre farm in Noble County, Ohio. Ralph Geiger, David Pauley, Scott Davis, and Timothy Kern were four of the men who responded to the posting. After luring these men to wooded locations, Mr. Beasley fatally shot and buried Mr. Geiger, Mr. Pauley, and Mr. Kern, and stole their possessions. Prior to the murder of Mr. Kern, Mr. Beasley had also lured Mr. Davis to a wooded area, where he attempted to shoot him in the head. However, the gun jammed, allowing time for Mr. Davis to escape.

As he ran from Mr. Beasley, Mr. Beasley was able to shoot him once in the arm. After hiding in the woods throughout the day, Mr. Davis made his way to a home where the residents called authorities for assistance.

{¶ 3} The officers investigating Mr. Davis' attack learned that Mr. Davis met Mr. Beasley after responding to the posting for the caretaker position. Thereafter, they learned that Mr. Pauley had been reported missing after responding to a similar advertisement. In the area where Mr. Davis had been attacked, police located the body of Mr. Pauley in a shallow grave.

{¶ 4} During the course of their investigation, the officers developed Mr. Beasley and Mr. Rafferty as suspects. On November 16, 2011, law enforcement officers went to Mr. Rafferty's high school and interviewed him. During this interview, the officers informed Mr. Rafferty that they were investigating a case regarding Mr. Beasley. Mr. Rafferty acknowledged that he and Mr. Beasley had breakfast with a man, whom the officers identified as Mr. Davis, at a restaurant in Marietta, Ohio, about one and a half weeks prior to the interview. Mr. Rafferty informed the officers that, after breakfast, they drove to Caldwell, Ohio, where Mr. Beasley and Mr. Davis had an altercation while they were driving on a country road. Mr. Beasley then told Mr. Rafferty to drop them off, which he did. Mr. Rafferty drove a short distance up the road, and he turned around and came back to where he had dropped the men off. When he came back, he saw Mr. Beasley walking. He picked him up, and Mr. Beasley informed Mr. Rafferty that Mr. Davis had to leave. Mr. Beasley and Mr. Rafferty then left the area. Mr. Rafferty confirmed that, about a week prior to meeting with Mr. Davis, Mr. Rafferty had traveled to this area with Mr. Beasley and eaten at a place called the Ashton. On that trip, they had just been driving around with no other purpose of being in that area. Mr. Rafferty also acknowledged that he and Mr. Beasley may have also met another man in Marietta, but he could not remember.

{¶ 5} During the interview at the school, officers seized Mr. Rafferty's car pursuant to the terms of a search warrant. After the school interview, the officers contacted the Noble County's Sheriff's Office to request an arrest warrant be issued for Mr. Rafferty.

{¶ 6} Later that day, the officers again interviewed Mr. Rafferty at his home with his parents present. During this interview, Mr. Rafferty's parents actively engaged in questioning Mr. Rafferty along with the officers. Mr. Rafferty maintained that the first time he went to Noble County with Mr. Beasley was two weeks to one month prior to the interview. During that trip, they had breakfast at a restaurant in Marietta with "the victim of the first attack." Over breakfast, Mr. Beasley discussed with a man (whom the officers noted was David Pauley) the details of a job working as a farmhand. After breakfast, they drove to Caldwell. Mr. Pauley left his truck and attached trailer at a gas station there, and then Mr. Pauley, Mr. Beasley, and Mr. Rafferty drove about ten minutes away up a gravel road. At some point, Mr. Beasley told Mr. Rafferty to pull over, because there was an area in the woods that they were going to use to access the

2

farm property. Mr. Beasley and Mr. Pauley got out of the car, and Mr. Beasley directed Mr. Rafferty to continue down the road and then turn around on the next road, and then come back. When Mr. Rafferty drove back, Mr. Beasley was alone. Mr. Beasley told Mr. Rafferty that he and Mr. Pauley had found the property, that they had sealed all the details of the job, and that he and Mr. Rafferty could leave now. They drove back to the gas station where Mr. Pauley had left his truck and trailer, and Mr. Beasley got into Mr. Pauley's truck and drove it. Mr. Rafferty did not know why Mr. Beasley was taking his truck.

{¶ 7} During the interview at his home, Mr. Rafferty maintained that he was under the impression that some items from Mr. Pauley's trailer were junk that Mr. Pauley needed to get rid of, including a tool chest, an ammo can, and a shot gun. Mr. Rafferty kept those items, which the officers found during their search of his bedroom.

{¶ 8} Mr. Rafferty further acknowledged that he went to Caldwell on a second occasion because Mr. Beasley informed him that Mr. Pauley had not worked out. This time, they met Mr. Davis for breakfast, and Mr. Davis and Mr. Beasley discussed the details of the job. They then all drove to Caldwell, and again, Mr. Beasley directed Mr. Rafferty to leave his truck and trailer at a gas station. The three then drove together to the same area where Mr. Rafferty had dropped off Mr. Beasley and Mr. Pauley. Just as before, he dropped off Mr. Beasley and Mr. Davis, and then kept driving until he reached a place where he could turn the car around. When he drove back to the location near where he had dropped the men off, Mr. Beasley was there, and he said that he had got Mr. Davis set up. Mr. Beasley and Mr. Rafferty then drove back to Akron.

{¶ 9} When questioned about whether Mr. Rafferty was aware of any pre-dug graves, he said he was not. However, he acknowledged that he had dug a hole in that area previously, which Mr. Beasley told him was for piping.

{¶ 10} After this second interview, the officers received the arrest warrant that they had requested earlier that day, and they placed Mr. Rafferty under arrest. The officers then transported Mr. Rafferty to a juvenile detention facility in Zanesville, Ohio.

{¶ 11} On November 23, 2011, Mr. Rafferty's public defender negotiated an agreement with the prosecutor and law enforcement officials, whereby Mr. Rafferty would provide a truthful account of the events and testify truthfully against Mr. Beasley. In exchange, the State agreed that he would only face charges for one count of complicity to murder and one count of complicity to attempted murder, he would not face additional charges for these or any other victims that he disclosed, and the federal government agreed not to prosecute Mr. Rafferty in connection with these events. Mr. Rafferty agreed to these conditions, and, on the same day, Mr. Rafferty gave a recorded proffer.

{¶ 12} In Mr. Rafferty's proffer, Mr. Rafferty explained that he and Mr. Beasley had the type of friendship where they trusted and would do anything for each other. In August of 2011, Mr. Beasley was hiding from law enforcement due to legal problems unrelated to this case. During this time, Mr. Beasley contacted Mr. Rafferty and told him he needed a new identity so that he could obtain employment. Mr. Beasley created the farmhand job as a scheme to steal an applicant's identity. Mr. Beasley met Mr. Geiger, who looked similar to Mr. Beasley and who was interested in the job. In August 2011, Mr. Beasley, Mr. Rafferty, and Mr. Geiger drove to a motel in Caldwell, Ohio. The next morning, they drove to the purported farm property, at which point Mr. Beasley pulled a pistol from the car, which he proceeded to load, stating that there might be a problem with coyotes in that area. They then entered the woods, where Mr. Beasley looked for the entrance to the farm property. After some amount of time, the men turned around, at which point Mr. Geiger was in front of Mr. Beasley, and Mr. Beasley fatally shot Mr. Geiger in the back of his head. Mr. Beasley and Mr. Rafferty then drug Mr. Geiger's body further into the woods, where Mr. Rafferty dug a hole and buried Mr. Geiger's body. Mr. Rafferty explained to the interviewers where the body was buried.

{¶ 13} Mr. Rafferty then stated that, later that year, Mr. Beasley informed Mr. Rafferty that another man, David Pauley, was driving to meet him regarding the advertised caretaker job. In October 2011, Mr. Rafferty drove Mr. Beasley to the same wooded area in Caldwell where Mr. Beasley had murdered Mr. Geiger. Mr. Rafferty dug a hole in the woods. They then went to meet Mr. Pauley for breakfast. After they ate, Mr. Beasley instructed Mr. Pauley to leave his truck and trailer at a grocery store because he would not be able to maneuver it on the road to the property. After they drove again to the wooded area, they all exited the vehicle, and Mr. Rafferty stayed behind as Mr. Beasley and Mr. Pauley walked up a hill. Mr. Rafferty heard Mr. Beasley shoot Mr. Pauley in the woods. Mr. Beasley then emerged from the woods, and Mr. Rafferty accompanied him back into the woods, where they drug Mr. Pauley's body to the hole they had previously dug and buried his body. Afterward, Mr. Rafferty and Mr. Beasley returned to the grocery store, where Mr. Beasley drove off with Mr. Pauley's truck and trailer, and Mr. Rafferty followed. They arrived at a house of two other men, and there they unpacked the truck. Mr. Beasley gave Mr. Rafferty a shotgun and several other items that he obtained from Mr. Pauley's possessions.

{¶ 14} Thereafter, another man, Scott Davis, responded to the caretaker advertisement. Mr. Rafferty explained that Mr. Beasley was excited because he anticipated that Mr. Davis would have a significant amount of property with him, for which Mr. Beasley could get a lot of money. Mr. Beasley and Mr. Rafferty again went to the wooded area in Caldwell and dug a hole. The next day, they met Mr. Davis for breakfast. After they ate, all three men went to a gas station, and then headed to Caldwell. When they reached the grocery store where Mr. Beasley had instructed Mr. Pauley to leave his truck, he again instructed Mr. Davis to leave his truck there. Mr. Rafferty then drove Mr. Beasley and Mr. Davis to the wooded area, and he let Mr.

Beasley and Mr. Davis out of the car, while Mr. Rafferty drove further up the road to turn the car around. When Mr. Rafferty returned, Mr. Beasley informed him that Mr. Davis had escaped because something was wrong with the gun. He told Mr. Rafferty that, if he saw Mr. Davis walking on the road, to hit him with the car. However, they did not see Mr. Davis on the road, and Mr. Beasley said he must have gone into the woods. Mr. Beasley and Mr. Rafferty then left that road, and Mr. Beasley disposed of his boots, gun, ammunition, computer and other items outside at other locations.

{¶ 15} After the attempted murder of Mr. Davis, Mr. Beasley informed Mr. Rafferty that another man, Timothy Kern, had responded to the advertisement. Mr. Beasley and Mr. Rafferty dug a hole in a wooded area near an abandoned shopping complex. The next day, Mr. Beasley and Mr. Rafferty met Mr. Kern in the parking lot of a pizza shop in Canton, Ohio. Mr. Beasley informed Mr. Kern that he wanted to look for a watch that he had lost while squirrel hunting. The three men went into the area where Mr. Rafferty had dug the hole, and Mr. Rafferty and Mr. Beasley pretended to look for Mr. Beasley's watch. Mr. Beasley then shot Mr. Kern in the head several times, and Mr. Beasley and Mr. Rafferty buried Mr. Kern's body in the hole they had previously dug. Mr. Beasley gave Mr. Rafferty the gun used to kill Mr. Kern.

{¶ 16} Mr. Rafferty further explained that Mr. Beasley did not threaten him directly, but after the murder of Mr. Geiger, Mr. Beasley would check in on him frequently, and he knew where his mother and sister lived.

{¶ 17} On November 25, 2011, law enforcement officers recovered the bodies of Mr. Geiger and Mr. Kern from the locations that Mr. Rafferty had provided in his proffer.

{¶ 18} On December 26, 2011, Mr. Rafferty's public defender presented Mr. Rafferty with a written agreement entitled "Defendant's Agreement[.]" Contained in that agreement was a provision that, if he did not comply with the terms of the agreement, Mr. Rafferty's November 23, 2011 proffer could be used against him in the State's case in chief. Mr. Rafferty ultimately signed the agreement. However, at a later court appearance, Mr. Rafferty indicated to his appointed counsel that he no longer wished to cooperate with the terms of the written agreement, and his appointed defense counsel relayed this to the prosecutor.

{¶ 19} Thereafter, Mr. Rafferty was charged with numerous other offenses stemming from these events. Mr. Rafferty obtained new defense counsel, who filed a motion to suppress statements he had made to law enforcement officers, including the two statements made on November 16, 2011, and the November 23, 2011 proffer.[1] The

---

[1] Mr. Rafferty also moved to suppress a statement he made to law enforcement on November 17, 2011.  The trial court initially denied the motion to suppress in regard to this statement, but later suppressed this statement prior to trial.  (This footnote appeared in the state appellate court opinion.)

trial court denied the motion in regard to these statements, and the case proceeded to trial.

{¶ 20} At trial, during the State's case in chief, over the objection of defense counsel, the tape recording of Mr. Rafferty's November 16, 2011 statements and his November 23, 2011 proffer were played to the jury and admitted into evidence. As part of the defense, Mr. Rafferty testified that his involvement in the murders was coerced because of Mr. Beasley's threats toward him and his family. The defense requested instructions on the affirmative defenses of duress, self-defense, and defense of others, and the trial court denied these requests.

{¶ 21} The jury found Mr. Rafferty guilty on numerous charges, including the aggravated murders of Mr. Geiger, Mr. Pauley, and Mr. Kern and the attempted murder of Mr. Davis. The trial court sentenced him to life in prison without the possibility of parole. Mr. Rafferty timely appealed, and he now raises five assignments of error for our review.

State v. Rafferty, No. 26724, 2015 WL 1932693, at *1-5 (Ohio Ct. App. 9th Dist. Apr. 29, 2015).[2]

### b.  Procedural History

#### i.  State Trial Court Proceedings

In February 2012, a Summit County, Ohio Grand Jury indicted Petitioner on three counts of aggravated murder, two counts of aggravated robbery, one count of attempted murder, two counts of kidnapping, two counts of grand theft, one count of petty theft, and one count of receiving stolen property.  (Doc. No. 8-1 at 3-9.)  The murder, attempted murder, robbery, and kidnapping charges also included firearm specifications.  (Id.)  In May 2012, Petitioner was subsequently indicted on six counts of aggravated murder, two counts of aggravated robbery, two counts of kidnapping, two counts of petty theft, and one count of identity fraud.  (Id. at 10-18.)  The murder, robbery, and kidnapping charges again carried firearm specifications.  (Id.)

---

[2] Petitioner does not dispute the facts as contained in the state appellate court opinion, but contends they are incomplete and require supplementing from the state court record.  (Doc. No. 34 at 2 n.1.)  However, the additional facts summarized in Petitioner's Objections do not affect or change the analysis herein.

After a jury trial, Petitioner was found not guilty of identity fraud and the firearm specifications attached to the kidnapping charges and guilty on all remaining charges and specifications.  (*Id.* at 23-25.)  On November 13, 2012, the trial court sentenced Petitioner to life imprisonment without the possibility of parole.  (*Id.* at 26-30.)

During the sentencing hearing, the trial court judge stated:

[THE COURT]: The evidence in this case clearly had you intertwined with Mr. Beasley. However, because I will hear his case in January, as difficult as it is I'm going to refrain from commenting on him, or the evidence as it pertains to him for purposes of this sentencing, because that is the appropriate thing to do, but there is one exception to that.

The law requires that I consider that as a teen you may have been more vulnerable or susceptible to outside influences, so it is only in that limited context that I will make any reference at all to Richard Beasley.

In determining your sentence, I have considered and do take into account your age, the fact that you have absolutely no prior record before getting into this situation. I know that you came from a broken home, raised by a single parent. Sadly many children are.

The fact that you were getting yourself off to kindergarten to me is heartbreaking. But the facts surrounding your mother's addictions, some things that came up, you know, regarding possible issues with your father, heartbreaking.

You got dealt a lousy hand in life, but none of that is an excuse for murder. The one thing that I have noticed is that you are so intelligent, you could have been so much more, you should have been so much more.

I do not discount the fact that Richard Beasley played a significant role in your life. He is about thirty-five years older than you. He came into your life when you were a very young boy. He clearly filled a need for you.

Because you were so young and because of the length of time he was in your life, you would have been more susceptible to being influenced by him, whatever that influence may have been.

What I do not accept and what the jury clearly rejected is the notion that you had no way out. The evidence showed that you had people in your life to whom you could have turned to and in whom you could have confided. Instead of doing so, you embraced the evil. You studied it. You continued with it.

7

The law tells me that because of your age, I am supposed to take into consideration the reckless nature of youth and the impetuousness of youth. But there was nothing reckless or impetuous about what happened. It was cold, calculated, methodical execution of three human beings and nearly a fourth.

It didn't happen over one day or even one weekend from which you could not escape. It stretched over a three-month period.

I am also supposed to determine whether you should have the opportunity for a parole hearing. They didn't give me a crystal ball with this black robe. I cannot predict what the future is for you in your heart, if your mind, chances of rehabilitation. All I can do is look at the evidence I heard before me.

And what I heard and the predictors I gleaned from that evidence is the number of deaths that were involved here, the method and manner of those deaths. Those factors weigh heavily against you, as did the fact that you had the opportunity to stop the deaths.

Perhaps, finally, I recall in your interview, the words about Tim Kern. You were clearly disturbed by his death, but I remember you saying that his was so unnecessary, he only had five bucks on him, what was left of the twenty he borrowed from his son. And I know that those probably are the poorly chosen words of a teenager, but it gives me some insight into what was going on because I couldn't help but wonder: Does that mean the other deaths were necessary? Or would twenty bucks have made Tim's death necessary or two hundred or a better car? I don't know.

I do know in light of all of the factors that I have placed on the record, and in weighing those factors, the only sentence that this Court deems proportionate for the crimes that you have committed is life in prison without possibility of parole.

Because of your cooperation, and assistance, albeit self-serving, you did cooperate early on, and because of the mitigating factors that this Court has stated on the record, including your youth and lack of record, the Court will run the sentences in this case concurrent and not consecutive, but for the firearm specifications, which are mandated to be consecutive.

(*Id.* at 325-29.)

### ii.  Direct Appeal

Through counsel, Petitioner filed a timely notice of appeal with the state appellate court.  (*Id.*

at 38.)  In his appellate brief, Petitioner raised five assignments of error:

8

1. The trial court erred by allowing the State to introduce the proffer and pretrial statements of Brogan Rafferty into his trial.

2. The court erred by failing to instruct the jury on the defense of duress or other affirmative defenses and by limiting the defense's experts['] testimony on those issues.

3. The court erred by allowing prejudicial and irrelevant evidence, including but not limited to internet searches on the Rafferty family computer.

4. The court's sentence of life without the possibility of parole for a juvenile is unconstitutional and contrary to law.

5. Brogan's first attorney was ineffective for inducing Brogan to proffer without competence and defense counsel was ineffective for not presenting evidence on mitigating factors in sentencing.

(*Id.* at 40-74.)  The State filed a responsive brief.  (*Id.* at 88-123.)  On April 29, 2015, the state appellate court overruled Petitioner's assignments of error and affirmed the trial court's judgment. *Rafferty*, 2015 WL 1932693.

Petitioner timely appealed this decision to the Ohio Supreme Court.  (Doc. No. 8-1 at 206-07.)  In his memorandum in support of jurisdiction, Petitioner raised two propositions of law:

1. A trial court's sentence of life without the possibility of parole for a juvenile convicted of complicity to commit aggravated murder is unconstitutional and contrary to law.

2. The Ohio Constitution prohibits sentencing a child to life without parole for any offense.

(*Id.* at 208-19.)  The State filed a waiver of memorandum in response.  (*Id.* at 220.)  On November 10, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to Ohio Supreme Court Practice Rule 7.08(B)(4).  (*Id.* at 221.)

The United States Supreme Court denied Petitioner's petition for a writ of certiorari on June 9, 2016.  (*Id.* at 222.)

### iii.  Application to Reopen

On July 28, 2015, through counsel, Petitioner filed an application to reopen his direct appeal pursuant to Ohio Appellate Rule 26(B).  (*Id.* at 223-33.)  Therein, he alleged his appellate counsel was ineffective for four reasons:

1. Rafferty's appellate counsel failed to properly argue his Fifth Amendment suppression claims.

2. Rafferty's appellate counsel failed to fully raise ineffective assistance of trial counsel.

   a.  Failure to request a change of venue.
   b.  Failure to object to gruesome photos and emotional testimony.
   c.  Failure to object to improper closing argument.
   d.  Failure to properly use defense expert.
   e.  Improperly opening the door to prejudicial State testimony.
   f.  Failure to request a limiting instruction.

3. Rafferty's appellate counsel failed to challenge the trial court's erroneous evidentiary rulings.

4. Rafferty's appellate counsel failed to challenge the trial court's erroneous jury instructions.

(*Id.*)  The State filed a memorandum in opposition.  (*Id.* at 284-93.)  On September 18, 2015, the state appellate court denied Petitioner's application to reopen, finding he had failed to comply with Appellate Rule 26(B)(2)(d).  (*Id.* at 294-96.)

### iv.  Federal Habeas Petition

On June 5, 2017, Petitioner filed a Petition for Writ of Habeas Corpus in this Court, raising two grounds for relief:

**GROUND ONE:**  The Eighth Amendment prohibits sentencing a child to life without the possibility of parole for a homicide offense which did not require a finding by the jury that the child personally killed or intended to kill.

10

**GROUND TWO:** The Eighth and Fourteenth Amendments categorically prohibit sentencing a juvenile to a sentence of life without the possibility of parole.

(Doc. No. 1.)  Respondent Warden Ed Sheldon ("Respondent") filed an Answer/Return of Writ on December 1, 2017, and Petitioner filed a Traverse on October 30, 2018.  (Doc. Nos. 8, 16.)

On November 18, 2019, the Magistrate Judge issued an R&R recommending that the Petition be denied.  (Doc. No. 26.)  The Magistrate Judge concluded that both of Petitioner's grounds for relief were procedurally defaulted because Petitioner had failed to fairly present his claims to all levels of the Ohio courts, and Petitioner could not demonstrate cause and prejudice to overcome the default.  (*Id.* at 12-20.)  Alternatively, even if not defaulted, the Magistrate Judge found that both grounds also failed on the merits.  (*Id.* at 16 n.6, 20-28.)

After receiving several extensions of time in which to file objections to the R&R, as well as filing two motions to stay that the Court denied, Petitioner filed Objections to the R&R on April 3, 2020.  (Doc. No. 34.)

## II.  Standard of Review

Parties must file any objections to a report and recommendation within fourteen days of service.  Fed. R. Civ. P. 72(b)(2).  Failure to object within this time waives a party's right to appeal the district court's judgment.  *See Thomas v. Arn*, 474 U.S. 140, 145 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).

When a petitioner objects to a magistrate judge's resolution of a dispositive matter, the district court reviews those objections *de novo*.  Fed. R. Civ. P. 72(b)(3).  Specifically, a district judge:

> must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

11

*Id.*  "A party who files objections to a magistrate [judge]'s report in order to preserve the right to appeal must be mindful of the purpose of such objections: to provide the district court 'with the opportunity to consider the specific contentions of the parties and to correct any errors immediately.'" *Jones v. Moore*, No. 3:04CV7584, 2006 WL 903199, at *7 (N.D. Ohio Apr. 7, 2006) (quoting *Walters*, 638 F.2d at 949-50).  An objection "that merely restates the arguments previously presented" or "does nothing more than state a disagreement with a magistrate's recommendation" is not sufficient.  *Id.*

"When a district judge reviews a magistrate judge's resolution of a non-dispositive matter, it is not a *de novo* review, as it is in relation to a magistrate judge's recommendation as to a dispositive matter."  *Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc.*, No. 2:07–cv–116, 2013 WL 992125, at *6 (S.D. Ohio Mar. 13, 2013).  Rather, the magistrate judge's decision is subject to review under Rule 72(a) and reversal when it "is clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); *see Alvarado v. Warden, Ohio State Penitentiary*, No. 3:16 CV 2563, 2018 WL 5783676, at *1 (N.D. Ohio Nov. 5, 2018); *Phillips v. LaRose*, No. 5:13-cv-693, 2019 WL 5729919, at *2 (N.D. Ohio Nov. 5, 2019).

## III.  Analysis

### a.  Exhaustion and Procedural Default

First, Petitioner objects to the Magistrate Judge's finding that both of Petitioner's grounds for relief are barred by procedural default.  (Doc. No. 34 at 11-19.)

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440

12

F.3d 754, 763 (6th Cir. 2006). "The procedural default rule is related to the statutory requirement that a habeas petitioner must exhaust any available state-court remedies before bringing a federal petition." *Lovins v. Parker*, 712 F.3d 283, 294 (6th Cir. 2013); *see* 28 U.S.C. § 2254(b), (c). "A claim may become procedurally defaulted in two ways." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

"First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806. As articulated by the Sixth Circuit, "[u]nder the independent and adequate state ground doctrine, a federal habeas claim is procedurally defaulted when: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default." *Lovins*, 712 F.3d at 296 (quoting *Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (en banc)).

"Second, a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999)). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id.* In other words, "a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition

13

is filed because of a state procedural rule." *Lovins*, 712 F.3d at 295.  "A claim is adequately raised

on direct appeal if it was 'fairly presented' to the state court."  *Williams*, 460 F.3d at 806.

### i.  Ground One

#### 1.  Procedural Default

The Magistrate Judge concluded that Ground One of the Petition was procedurally defaulted

because Petitioner had not fairly presented the claim to the state appellate court, and the Ohio

Supreme Court therefore declined to reach the merits of the claim.  (Doc. No. 26 at 12-16.)

Specifically, the Magistrate Judge found that before the state appellate court, Petitioner argued that

his sentence was unconstitutional under the Eighth Amendment because the trial court failed to

consider specific mitigating factors before imposing a sentence of life without parole on a juvenile,

which is distinct from the claim presented in Ground One that imposing such a sentence on a juvenile

upon an accomplice-liability based homicide conviction was *per se* unconstitutional.  (*Id.*)  Further,

although Petitioner did present his claim in Ground One to the Ohio Supreme Court, the Magistrate

Judge held that it must be assumed that the Ohio Supreme Court applied its own procedural rules

when it declined to reach the merits of the claim, as the Ohio Supreme Court will not consider

constitutional claims not raised and preserved in the Ohio court of appeals.  (*Id.* at 15-16.)

Petitioner objects to the Magistrate Judge's conclusions.  Petitioner argues that he did present

Ground One to the state appellate court, as he asserted the deprivation of a specific constitutional

right and provided the state appellate court with the facts upon which that right was denied.  (Doc.

No. 34 at 14-15.)  Petitioner also asserts that in determining whether a state court rested its holding

on a state procedural rule so as to bar federal habeas review, courts must look to the last explained

state-court judgment, which is the state appellate court opinion in this case, and there is nothing in

the state court record that necessitates the conclusion that the Ohio Supreme Court failed to allow Petitioner's appeal based upon any perceived default. (*Id.* at 15-16.) The Court finds Petitioner's objections unpersuasive.

First, as noted above, in order to adequately raise a claim on direct appeal, it must be "'fairly presented' to the state court." *Williams*, 460 F.3d at 806. "A claim may only be considered 'fairly presented' if the petitioner asserted both the factual and legal basis for his claim to the state courts." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). The Sixth Circuit "has noted four actions a defendant can take which are significant to the determination [of] whether a claim has been 'fairly presented': (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Id.* "General allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." *Id.*

In addition, the claim must be "be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) ("Petitioner's second ineffective assistance claim rests on a theory which is separate and distinct from the one previously considered and rejected in state court."); *see also Lyons v. Stovall*, 188 F.3d 327, 332 (6th Cir. 1999) (holding petitioner failed to fairly present claim to state courts because "although Petitioner raised the evidentiary claim to the state appellate courts, he argued it on the basis that he was denied his Fourteenth Amendment right to a fair trial because the evidence was more prejudicial than probative, not because the evidence violated the presumption of innocence as he argues to the federal

courts").  However, courts "do not require word-for-word replication of the state claim in the *habeas corpus* petition in order to address the merits therein, only that the petitioner 'fairly present' the substance of each of his federal constitutional claims to the state courts."  *Carter v. Bell*, 218 F.3d 581, 606 (6th Cir. 2000).

In the instant matter, before the state appellate court, Petitioner claimed that the trial court's sentence of life without the possibility of parole was unconstitutional and contrary to law.  (Doc. No. 8-1 at 68.)  Specifically, in support of this claim, Petitioner argued:

> In the landmark case, *Miller v. Alabama*, 132 S[.] Ct. 2455 (2012), the United States Supreme Court held that [t]he Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile homicide offenders. While *Miller* did not foreclose the sentencing court's option to impose life without parole on a juvenile convicted of a homicide, it required consideration of "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller* requires the trial court to consider mitigating factors when sentencing a juvenile offender. The trial Court failed to consider the mitigating factors ***at the time of sentencing*** in [Petitioner's] case. The trial court did not have the guidance of a pre-sentence investigation report, did not hear psychological testimony regarding [Petitioner's] maturity, did not hold a separate evidentiary hearing on the issue of mitigating factors and did not state that it was considering the mitigating factors pursuant to *Miller* when it sentenced [Petitioner] to a life sentence.

(*Id.* at 68-69.)  Petitioner asked the state appellate court to "vacate [Petitioner's] sentence and remand this case for re-sentencing so that the Court can adequately and thoroughly consider the *Miller* factors and evidence supporting each factor."  (*Id.* at 72.)

In contrast, in Ground One of his Petition before this Court, Petitioner asserts that the "Eighth Amendment prohibits sentencing a child to life without the possibility of parole for a homicide offense which did not require a finding by the jury that the child personally killed or intended to kill." (Doc. No. 1 at 5.)  As the Magistrate Judge correctly concluded, the argument presented before the state appellate court—that the trial court failed to consider specific mitigating factors before imposing

a sentence of life without parole on a juvenile—and the argument presented in Ground One—that it was *per se* unconstitutional to impose such a sentence on a juvenile who did not kill or intend to kill—rest on distinctly separate legal theories.

Moreover, in his memorandum in support of jurisdiction to the Ohio Supreme Court, Petitioner admitted that he had not presented the legal claim in Ground One to the state appellate court:

> During the sentencing hearing, [Petitioner] objected to the sentence of life without the possibility of parole. (11/9/12, T.p. 37). At the appellate level, [Petitioner] again objected to his sentence, but the court of appeals overruled this assignment of error, holding that the trial court's sentence of life without the possibility of parole was proper. *See State v. Rafferty*, 9th Dist. No. 26724, 2015-Ohio-1629, ¶118-126.

> ***In neither case did [Petitioner] specifically argue that it was unconstitutional to impose a sentence of life without the possibility of parole on the basis that he did not commit a "homicide" offense*** as that term was used in *Graham*. However, [Petitioner] is now arguing it was plain error for the trial court to impose such a sentence, and that but for the plain or obvious error, the outcome of the proceeding would have been otherwise, and therefore reversal is necessary to correct a manifest miscarriage of justice. *See State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶16.

> \* \* \*

> This Court should accept review of this case on this very important question of law and determine if it is constitutional to impose a life sentence without the possibility of parole on juveniles convicted of murder when they were not the principle offender, but rather convicted under a theory of complicity, including where the juvenile did not personally use any force against the victim.

(Doc. No. 8-1 at 214, 216 (emphasis added).)

Thus, the Court agrees with the Magistrate Judge's conclusion that Petitioner did not fairly present his claim in Ground One to the state appellate court.

Next, although Petitioner did present his claim in Ground One to the Ohio Supreme Court, the Magistrate Judge concluded that the Ohio Supreme Court declined to reach the merits of his claim

17

due to a state procedural rule, resulting in the procedural default of Ground One.  (Doc. No. 26 at 15-16.)  Petitioner objects to this conclusion, asserting it is unwarranted because the Court must look to the last explained state-court judgment to determine whether a state court rested its holding on procedural default, which is the state appellate court's decision in this case.  (Doc. No. 34 at 15-16.)  The Court finds Petitioner's arguments in this regard lack merit.

It is true that "a federal court may 'look through' an unexplained order to the last reasoned state court judgment and presume that the Ohio Supreme Court's unexplained order rests on the same grounds as the reasoned judgment."  *Eskridge v. Konteh*, 88 F. App'x 831, 837 (6th Cir. 2004).  However, as described above, Petitioner did not raise his claim in Ground One before the state appellate court, and, therefore, the state appellate court did not address the issue.  In such a situation, the Sixth Circuit has held: "Where a state supreme court issued an unexplained order dismissing claims that were never addressed in judgments by lower state courts, this Court may invoke an applicable state procedural bar on behalf of the state supreme court."  *Id.*; *see also Simpson v. Sparkman*, 94 F.3d 199, 203 (6th Cir. 1996) ("Even though the Kentucky Court of Appeals was silent as to its reasons for denying petitioner a writ of habeas corpus on his due process claim, we will not assume that the court did not observe the applicable procedural bar.  Instead, we will assume that had the state court addressed petitioner's due process claim, it would not have ignored its own procedural rules and would have enforced the procedural bar.").

Significantly, it is well established that the Ohio Supreme Court will "not consider constitutional claims not raised and preserved in the Ohio Court of Appeals."  *Leroy v. Marshall*, 757 F.2d 94, 99 (6th Cir. 1985) (quoting *Fornash v. Marshall*, 686 F.2d 1179, 1185 n.7 (6th Cir. 1982)); *Smith v. Warden*, No. 1:09–cv–251, 2010 WL 3075166, at *14 (S.D. Ohio Apr. 14, 2010) ("Although

petitioner raised these claims in his appeal to the Ohio Supreme Court, that action in itself did not preserve the claims for habeas review. 'The Ohio Supreme Court has stated that it will not consider constitutional claims not raised and preserved in the Ohio Court of Appeals.'"), *report and recommendation adopted*, 2010 WL 3075276 (S.D. Ohio Aug. 4, 2010) (quoting *Leroy*, 757 F.2d at 99).

Here, although the Ohio Supreme Court was silent as to its reasons for declining to accept jurisdiction of Petitioner's appeal, the Court will not assume that the Ohio Supreme Court did not observe the applicable procedural bar.  Instead, the Court must assume the Ohio Supreme Court declined to rule on the merits of Petitioner's claim because he had not raised and preserved it in the state appellate court.  *See Konteh*, 88 F. App'x at 837-38.  Accordingly, the Court concludes the Magistrate Judge correctly found that Ground One was barred unless Petitioner could show cause and prejudice to overcome the procedural default.

### 2.  Cause and Prejudice

The Magistrate Judge determined that Petitioner could not show cause to overcome the procedural default of Ground One.  (*See* Doc. No. 26 at 19-20.)  In his Traverse, Petitioner asserted that even if his claims were defaulted, he could demonstrate cause to excuse the default because his appellate counsel on direct appeal was ineffective for failing to adequately address the constitutionality of his sentence under the Eighth Amendment.  (Doc. No. 16 at 35.)  The Magistrate Judge found this insufficient to establish cause because, although ineffective assistance of counsel generally may constitute cause for a procedural default, a petitioner must first present the ineffective assistance of counsel claim as an independent claim to the state courts.  (Doc. No. 26 at 20.)  The Magistrate Judge noted that when Petitioner filed to reopen his direct appeal, he did not argue that

19

his appellate counsel was ineffective for failing to raise the claims he now attempts to raise in his Petition.  (*Id.*)  As a result, the Magistrate Judge concluded Petitioner's ineffective assistance of appellate counsel claim was itself procedurally defaulted, and, therefore, could not serve as cause to excuse his default.  (*Id.*)  In his Objections, Petitioner argues that even though his ineffective assistance of appellate counsel claim is defaulted, it may still be used to establish cause if there is also cause and prejudice to excuse that default.  (Doc. No. 34 at 18-19.)  As cause to excuse the default of his ineffective assistance of appellate counsel claim, Petitioner asserts that his counsel that filed to reopen his direct appeal was also ineffective "for failing to address the inclusion of a full consideration of the constitutionality of his [life without parole] sentence."  (*Id.* at 18.)  The Court finds Petitioner's argument lacks merit.

A petitioner may avoid procedural default "by showing that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case."  *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000).  To establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him."  *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007).  Constitutionally ineffective assistance of counsel may constitute cause for a procedural default.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  However, "[t]he Supreme Court has held that a defendant generally must present the claim of ineffective assistance of counsel to the state courts as 'an independent claim before it may be used to establish cause for a procedural default.'"  *Scuba v. Brigano*, 527 F.3d 479, 487 (6th Cir. 2007) (quoting *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)).  If a petitioner fails to properly present the ineffective assistance of counsel claim to the state courts, that claim itself is procedurally defaulted.  *See Seymour*, 224 F.3d at 550.  "[A] procedurally defaulted

20

ineffective-assistance-of-counsel claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards*, 529 U.S. at 450-51.

Also, relevant here, "[w]here there is no constitutional right to counsel, a petitioner cannot claim constitutionally ineffective assistance of counsel." *Contrearus v. Hooks*, No. 3:15-CV-0783, 2016 WL 3976383, at *7 (N.D. Ohio July 1, 2016), *report and recommendation adopted*, 2016 WL 3952121 (N.D. Ohio July 22, 2016). "Ohio Appellate Rule 26(B) filings are collateral proceedings to which a defendant has no Sixth Amendment right to the assistance of counsel." *Scuba*, 527 F.3d at 489. Thus, "counsel's failures in connection with a Rule 26(B) application cannot serve as cause to excuse a procedural default because there is no right to counsel at that stage." *McClain v. Kelly*, 631 F. App'x 422, 437 (6th Cir. 2015); *Abshear v. Moore*, 354 F. App'x 964, 971 (6th Cir. 2009) ("Abshear cannot again rely upon ineffective assistance of counsel or lack of counsel because Rule 26(B) proceedings are considered collateral, meaning Abshear had no Sixth Amendment right to an attorney."); *Scuba*, 527 F.3d at 489.

In this case, Petitioner asserts that the ineffectiveness of his appellate counsel provides cause for the procedural default of Ground One. (Doc. No. 34 at 18.) Petitioner does not dispute that his ineffective assistance of appellate counsel claim is also defaulted, and that he therefore must establish cause and prejudice with respect to his ineffective assistance of appellate counsel claim for it to serve as cause to overcome the default of the grounds for relief in his Petition. (*Id.*) As cause for the default of his ineffectiveness assistance of appellate counsel claim, Petitioner relies on the ineffectiveness of his counsel that filed to reopen his direct appeal under Ohio Appellate Rule 26(B). (*Id.*) Because there is no right to counsel in connection with a Rule 26(B) application, however, Petitioner cannot

rely on his counsel's failures in connection with his Rule 26(B) application to excuse a procedural default.  As a result, Petitioner cannot establish cause to overcome the procedural default of his ineffective assistance of appellate counsel claim, which means that claim cannot serve as cause to overcome the procedural default of Ground One of his Petition.  Consequently, the Magistrate Judge correctly determined that Ground One is procedurally defaulted, and Petitioner cannot establish cause and prejudice to excuse the default.

### ii.  Ground Two

#### 1.  Procedural Default

The Magistrate Judge found that Ground Two was procedurally defaulted because it was not presented to the Ohio Supreme Court, noting that "[a]lthough many of Petitioner's claims in the state courts are based on the Eighth Amendment (or cases relying thereupon), and attack his life-without-parole sentence, none raise the precise federal issue presented to this Court – that the Eighth Amendment '*categorically prohibit[s]*' sentencing a juvenile to life without parole."  (Doc. No. 26 at 19.)  In his Objections, Petitioner again argues that he did properly present the issues in Ground Two to both the state appellate court and the Ohio Supreme Court, asserting that the factual basis for Ground Two was presented to both state courts and that Ground Two was necessarily a part of his first proposition of law before the Ohio Supreme Court.  (Doc. No. 34 at 16.)  While Petitioner's Objections on this issue may have merit, the Court need not address them, as the Court agrees with the Magistrate Judge's alternative conclusion that Ground Two fails on the merits.  *See Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008) ("'[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits,' especially where the procedural

22

default issue is 'complicated' and 'is unnecessary to [the] disposition of the case.'") (quoting *Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003)).

### b. Merits

In the alternative to the dismissal of Petitioner's claims based on procedural default, the Magistrate Judge recommended that the Petition be denied on the merits because Petitioner failed to establish that his sentence violates the Constitution.  (Doc. No. 26 at 16 n.6, 27-28.)  Petitioner argues the Magistrate Judge erred in this regard, as he contends there is clearly established federal law that a sentence of life without parole for any juvenile, especially one convicted of aiding and abetting a homicide, is prohibited by the Eighth Amendment.  (Doc. No. 34 at 19-31.)  The Court agrees with the Magistrate Judge that even assuming Petitioner's grounds for relief are not procedurally defaulted, they fail on the merits.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and quotations omitted).  Pursuant to AEDPA, habeas corpus relief is unavailable with respect to any claim adjudicated on the merits in state court unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[F]or a state court's decision to be 'contrary to' clearly established Supreme Court precedent, it must 'arrive[ ] at a conclusion opposite to that reached by [the Supreme Court] on a question of

23

law[,]' or it must face a set of 'facts that are materially indistinguishable from a relevant Supreme Court precedent and' still arrive at an opposite result." *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

This is distinct from an "unreasonable application of" Supreme Court precedent, which occurs "when the state court correctly identifies the governing legal principle in the case, yet it unreasonably applies that principle to the facts of the defendant's case." *Id.* Under this standard, federal courts may not overturn a state court's decision simply because they believe that the state court applied Supreme Court precedent incorrectly. *Id.* "Instead, the state court's application of Supreme Court precedent must also be objectively unreasonable." *Id.* This means "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

In addition, the Supreme Court has made clear that the phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," as used in 28 U.S.C. § 2254(d), "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

### i.  Ground One

In Ground One, Petitioner asserts that his sentence violates the Constitution because "[t]he Eighth Amendment prohibits sentencing a child to life without the possibility of parole for a homicide offense which did not require a finding by the jury that the child personally killed or intended to kill." (Doc. No. 1 at 5.)  In support of this proposition, Petitioner relies on numerous Supreme Court cases

interpreting the Eighth Amendment.  (Doc. No. 34 at 19-30.)  Several of these cases distinguish juvenile from adult offenders for purposes of Eighth Amendment analysis.  *See, e.g.*, *Miller v. Alabama*, 567 U.S. 460, 465 (2012) (holding that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments'"); *Graham v. Florida*, 560 U.S. 48, 74 (2010) (holding "for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole"); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (holding "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed").  Petitioner also cites to a number of social science articles regarding juveniles and recent federal and state legislation related to the sentencing of juvenile offenders.  (*See* Doc. No. 34 at 19-30.)  However, Petitioner has not identified any cases in which the Supreme Court clearly established that the Eighth Amendment prohibits sentencing a juvenile to life without the possibility of parole for a homicide offense that did not require a finding by the jury that the juvenile personally killed or intended to kill, as he contends in Ground One.  Most relevant to his claim are the Supreme Court's decision in *Graham* and Justice Breyer's concurring opinion in *Miller*, but neither entitles him to relief.

In *Graham*, the Supreme Court held that the Eighth Amendment prohibits the imposition of a sentence of life without parole on a juvenile "who did not commit homicide."  560 U.S. at 74.  In support of its holding, the Supreme Court noted that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers," and "[i]t follows that, when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability."  *Id.* at 69.  This language

25

would seem to support a prohibition on sentencing a juvenile to life without parole if he or she is convicted of a homicide offense but did not personally kill or intend to kill.  However, the Supreme Court did not clearly make that a part of its holding, as it only expressly prohibited life without parole for juvenile offenders "who did not commit homicide."  *Id.* at 74, 82; *see Hernandez v. McDonald*, No. CV 12–265–RGK (SP), 2015 WL 164707, at *7 (C.D. Cal. Jan. 9, 2015) (finding *Graham* inapplicable despite the fact that the petitioner was convicted of felony murder, which did not require a finding that the petitioner was the actual killer or possessed any intent to kill); *see also Trimble v. Trani*, No. 09–cv–01943–REB, 2011 WL 3426207, at *4 (D. Colo. Aug. 5, 2011) ("*Graham* is expressly limited to nonhomicide offenders; Mr. Trimble was convicted of felony murder.  Therefore, *Graham* has no application to him.").

In this case, although the jury was not required to find that Petitioner personally killed or intended to kill, Petitioner was convicted of multiple counts of aggravated murder.  Because Petitioner was convicted of murder, it is not an unreasonable application of *Graham* to conclude that its ban on sentencing juveniles convicted of nonhomicide offenses to life without parole is inapplicable to Petitioner's circumstances.  As such, Petitioner cannot show that the state appellate court's decision upholding his sentence was contrary to, or involved an unreasonable application of, *Graham*.

Petitioner also points to Justice Breyer's concurring opinion in *Miller* as further support of his claim in Ground One.  (Doc. No. 34 at 23-24.)  In his concurring opinion, Justice Breyer stated that "the kinds of homicide that can subject a juvenile offender to life without parole must exclude instances where the juvenile himself neither kills nor intends to kill the victim."  *Miller*, 567 U.S. at 490.  According to Justice Breyer, "*Graham* dictates a clear rule: The only juveniles who may constitutionally be sentenced to life without parole are those convicted of homicide offenses who 'kill

or intend to kill.'" *Id.* at 492 (quoting *Graham*, 560 U.S. at 69). However, this is a concurring

opinion, which does not constitute clearly established law under AEDPA. *Williams*, 529 U.S. at 412.

As explained by another court to address the same issue that is presented here:

> The court recognizes there is some persuasive support in the caselaw for petitioner's
> argument that because he was not the actual killer his sentence violates the Eighth
> Amendment. In particular, in a concurring opinion in *Miller*, Justice Breyer opined
> that under *Graham*, "the kinds of homicide that can subject a juvenile offender to life
> without parole must exclude instances where the juvenile himself neither kills nor
> intends to kill the victim," and even instances where the juveniles were major
> participants in the felony and had a mental state of reckless indifference to human life.
> *Miller*, 132 S.Ct. at 2475–76. Justice Breyer further opined that "*Graham* dictates a
> clear rule: The only juveniles who may constitutionally be sentenced to life without
> parole are those convicted of homicide offenses who 'kill or intend to kill.'" *Id.* at
> 2476. Although this concurring opinion supports petitioner's argument, it is not the
> holding of the case, and therefore does not constitute clearly established federal law.
> As such, even if the California Court of Appeal's decision is contrary to this
> concurring opinion, it does not entitle petitioner to federal habeas relief.

*Hernandez*, 2015 WL 164707, at *8. The Court agrees with this reasoning and finds that Justice

Breyer's concurring opinion in *Miller* does not entitle Petitioner to relief.

Because Petitioner fails to establish in Ground One that the state appellate court decision was

either contrary to, or an unreasonable application of, clearly established federal law, as determined

by the Supreme Court, the Magistrate Judge was correct to conclude that Ground One should be

denied on the merits even if it was not procedurally defaulted.

### ii. Ground Two

In Ground Two, Petitioner asserts that his sentence is unconstitutional because "[t]he Eighth

and Fourteenth Amendments categorically prohibit sentencing a juvenile to a sentence of life without

the possibility of parole." (Doc. No. 1 at 7.) In support of Ground Two, Petitioner relies on the same

Supreme Court precedent, social science, and evidence of the evolving standards of juvenile justice

offered in support of Ground One. (Doc. No. 34 at 31.) The Court concludes that the Magistrate

Judge correctly determined that Ground Two also fails on the merits, as the Supreme Court has not clearly established such a categorical prohibition on life without parole sentences for juveniles.

In *Miller*, the Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment "forbids a sentencing scheme that *mandates* life in prison without possibility of parole for juvenile offenders."  567 U.S. at 479 (emphasis added).  However, the Supreme Court expressly declined to consider the "alternative argument that the Eighth Amendment requires a *categorical bar* on life without parole for juveniles."  *Id.* (emphasis added).  Instead, while the Supreme Court noted that appropriate occasions for such a sentence will be uncommon, it did not foreclose such a sentence if a court "take[s] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  *Id.* at 479-80.  Thus, there is no clearly established federal law supporting the broad proposition asserted in Ground Two of the Petition—that the Eighth Amendment "categorically prohibit[s] sentencing a juvenile to a sentence of life without the possibility of parole."  (Doc. No. 1 at 7.)

Further, the state appellate court decision—holding that Ohio's sentencing scheme does not violate *Miller*, and that the sentencing court adequately considered Petitioner's youth as a mitigating factor during sentencing and thus did not err—is not unreasonable.  At the sentencing hearing, the trial court considered Petitioner's youth, his background, and the influence of Petitioner's co-defendant, Beasley.  (*See* Doc. No. 8-1 at 325-29.)  The trial court determined that under the circumstances of Petitioner's individual case, however, a life without parole sentence was appropriate.  (*Id.*)  As a result, Petitioner has not shown that the state appellate court decision was contrary to, or an unreasonable application of, *Miller* or any other case.  As such, the Court agrees with the Magistrate Judge's conclusion that Ground Two should be denied on the merits.

### c.  Evidentiary Hearing

In the Magistrate Judge's R&R, he also denied Petitioner's request for an evidentiary hearing, finding that the claims presented in the Petition involved legal issues that could be resolved by the State court record.  (Doc. No. 26 at 28.)[3]  Petitioner objects to this ruling, asserting that a hearing should be conducted because the trial court did not fully address the mitigating circumstances of Petitioner's role under a complicity liability theory.  (Doc. No. 34 at 31.)

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id.*  Here, the Court agrees with the Magistrate Judge that the legal issues in the Petition could be resolved by the state court record and preclude habeas relief.  Consequently, no evidentiary hearing was necessary.

### d.  Certificate of Appealability

Finally, Petitioner requests that the Court issue a certificate of appealability on all issues relating to exhaustion and the merits of his claims that his sentence violates the Eighth Amendment's prohibition of cruel and unusual punishment.  (Doc. No. 34 at 31-32.)  Petitioner argues that a certificate should be granted with respect to exhaustion because the only issue is whether he presented his claims specifically enough to the state courts.  (*Id.* at 32.)  With regard to the merits, Petitioner

---

[3] "Motions for an evidentiary hearing in a habeas case are pre-trial, non-dispositive motions on which the magistrate judge may rule directly rather than making a recommendation."  *Smith v. State of Ohio*, No. 4:18-CV-00512, 2019 WL 6352748, at *8 n.99 (N.D. Ohio July 31, 2019), *report and recommendation adopted*, 2019 WL 6341663 (N.D. Ohio Nov. 27, 2019).

points out that the Magistrate Judge himself noted that "Petitioner presents a compelling argument about juvenile life sentences generally, as well as the underlying circumstances in his case specifically." (*Id.* at 31.)

A certificate of appealability may issue only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner may meet this standard by showing that reasonable jurists could debate whether the petition should have been determined in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Dufresne v. Palmer*, 876 F.3d 248, 252 (6th Cir. 2017) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). In addition, "[i]f the petition was denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Id.* (quoting *Slack*, 529 U.S. at 484).

Taking the above standards into consideration, the Court will not issue a certificate of appealability with respect to either ground for relief. For the reasons described above, no jurist of reason would find it debatable that Ground One is procedurally defaulted and that Ground Two fails on the merits.

**IV.    Conclusion**

For the reasons set forth above, Petitioner's Objections (Doc. No. 34) are OVERRULED. Accordingly, the Magistrate Judge's Report & Recommendation (Doc. No. 26) is ADOPTED as set forth herein, and the Petition (Doc. No. 1) is DENIED. Further, the Court certifies that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

30

**IT IS SO ORDERED.**


 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  September 23, 2020                              U. S. DISTRICT JUDGE

31